Harry L. Sparks and Rex Wanda Sparks v. Commissioner.
Sparks v. Commissioner
Docket No. 52914.
United States Tax Court
T.C. Memo 1956-71; 1956 Tax Ct. Memo LEXIS 244; 15 T.C.M. (CCH) 364; T.C.M. (RIA) 56071; March 3, 1956
*244 Family partnership. - Held, petitioners failed to sustain their burden of showing that father and son in good faith and acting with a business purpose intended to join together in the present conduct of an enterprise. William P. Rosenthal, Esq., and Leonard Schanfield, Esq., for the petitioners. Robert R. Veach, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioners' income tax liability for the calendar years 1948 and 1949 in the amounts of $17,309.12 and $4,656.42, respectively. The deficiencies resulted from respondent's refusal to recognize a partnership between petitioner Harry L. Sparks and his son Joe C. Sparks, and his consequent inclusion of income reported by Joe C. Sparks in petitioners' income for the years in question. Findings of Fact The stipulated facts and the exhibits accompanying the stipulation are incorporated herein by reference. Petitioners are husband and wife residing in Clayton, Missouri. Joe C. Sparks is petitioners' son, born February 10, 1938. Harry Sparks is considerably older than his wife, Wanda. For the years 1948 and 1949 petitioners filed joint *245 returns with the then collector of internal revenue for the eighth district of Illinois at Springfield, Illinois. Harry's business consists of buying and selling hogs, and at all times material hereto he was a licensed dealer and market agent in livestock under the Packers and Stockyards Administration, a division of the United States Department of Agriculture. Since 1920 Harry has been continuously engaged in buying and selling livestock. In 1931 the business was organized as a sole proprietorship under the name of H. L. Sparks & Company (hereinafter referred to as the company). The business of the company consists of buying and selling hogs principally to packers, and to traders and feeder buyers at National Stock Yards, Illinois. Most of its purchases are made as a dealer to fill orders already received; some purchases are made without prior orders in the hope of resale. In either case the purchase and resale are generally made the same day. If resale is not made the same day and is not likely to be made the next day, the hogs are turned over to commission agents for resale. The company's volume of business varies from $10,000 to $150,000 daily. In 1948 and 1949 its gross receipts *246 were over $15 million and $13 million, respectively. Collections from customers are made by sight draft, by moneywire receipts, or by checks mailed after wire notification of amount due. These collections include Harry's commission which is added to the purchase price of the hogs shipped. The operation of the business is almost wholly dependent on Harry's personal services. In proportion to the amount of business done the amount of actual cash needed in the company's bank accounts is slight. The company is financially able to do a large volume of business by getting payment for its sales as soon as possible in order to cover its own checks given in payment for the hogs sold. Inventories are a minor factor in the company's business; at the end of 1948 and 1949 the inventories shown on its balance sheets were $2,035 and $2,017, respectively. During the years 1938 through 1940 the company financed its purchases through a clearing house and was required to pay financing charges for these short-term loans. In order to eliminate these financing charges Harry tried to borrow money from a bank but did not make the loan because the bank wanted too much collateral. Harry persuaded his wife, *247 Wanda, to put approximately $5,000 of her own funds in the business late in 1940. Prior to this time Wanda had made small loans to the business. On January 2, 1941, they executed an agreement titled "PARTNERSHIP AGREEMENT - H. L. Sparks Commission Company." The agreement provided that the business of the H. L. Sparks Commission Company would thereafter be operated as a partnership with Harry and Wanda having one-half interests; Harry was to be in control of all business activities; Wanda was to receive no salary unless her services were required in the business; partnership profits were to be divided equally; mutual consent to withdrawals of money was given and was to be revoked only upon written notice; withdrawal from the partnership was to be made only after appropriate written notice; the partnership interest of one partner was not to be assigned or sold without being first offered to the other partner at the book value on the date of sale. The agreement also stated that Harry had a one-half interest in Midwest Order Buyers, which was carried as an asset of H. L. Sparks Commission Company, and that by virtue of her interest in H. L. Sparks Commission Company, Wanda was to receive *248 one-half of Harry's interest in Midwest, i.e., a one-fourth interest in Midwest Order Buyers. In an agreement dated December 20, 1941, Harry and Wanda stated that the net worth of the H. L. Sparks Company was not to exceed $10,000; any amounts in the partnership in excess of this net worth were to be carried as debts owed to the partners, Harry and Wanda, and would bear interest of four per cent annually. In an instrument dated December 30, 1941, it was stated that Wanda transferred to Joe C. Sparks her one-half interest in H. L. Sparks Company which included her one-fourth interest in Midwest Order Buyers. This transfer was made with the consent of Harry. Wanda's purpose in making the transfer was to provide financial security for Joe C. Sparks. After a few years, when Midwest Order Buyers began to lose money, the interest in Midwest in Joe's name was taken off the books of H. L. Sparks & Company. In March 1942 petitioners, upon their application, were appointed curators of the estate of Joe C. Sparks by the Probate Court of the City of St. Louis, Missouri. In July of the same year an inventory and appraisal of the estate of Joe C. Sparks was filed with the court, showing its *249 value as $3,000 in cash. For each of the years 1943 through 1953, inclusive, petitioners, as curators of the estate of Joe C. Sparks, filed an annual settlement of all the monies and property received and expended on behalf of the estate. The settlement for 1943 showed that the estate had $2,900 in government bonds, $100 in a bank deposit, a one-half interest in H. L. Sparks & Company valued at $5,000, and a one-fourth interest in Midwest Order Buying Company valued at approximately $2,500. In settlements filed for the succeeding years Joe C. Sparks' partnership interests were valued as follows: H. L. Sparks
Midwest
& Company
Order Buying
1944
$ 5,000
$2,500
1945
5,000
2,500
1946
5,000
2,500
1947
(no report in evidence)
1948
5,000
2,500
1949
15,166.56
2,500
1950
17,166.56
3,500
1951
14,732
3,500
1952
12,732
3,500 Attached to the 1953 settlement was the following statement of Joe C. Sparks' personal and capital accounts in H. L. Sparks & Company for the years 1946 through 1952: Balance
Beginning
Distribution
Balance
Capital
Date
of Year
of Profits
Drawing
End of Year
Account
Year Ended 12/31
1946
$17,168.95
$16,980.20
$ 5,432.99
$28,716.16
$5,000.00
1947
28,716.16
9,292.91
19,703.00
18,306.07
5,000.00
1948
18,306.07
24,316.97
42,623.04
5,000.00
1949
42,623.04
9,039.14
51,662.18
5,000.00
1950
51,662.18
5,390.71
57,052.89
5,000.00
1951
57,052.89
4,642.61
1,407.94
60,287.56
5,000.00
1952
60,287.56
197.65
842.55
59,642.66
5,000.00
*250 Upon examination of the partnership return filed by Harry and Wanda Sparks for 1941 and the partnership returns filed by Harry L. and Joe C. Sparks for 1942 and 1943, it was determined by the examining revenue agent that the entire income of H. L. Sparks & Company was taxable to Harry. This determination was accepted by Harry, and for 1944 and 1945 the entire income of H. L. Sparks & Company was reported by him on his individual income tax returns. No partnership returns were filed for H. L. Sparks & Company for 1944 and 1945, and no allocation of earnings for those years was made to Joe C. Sparks on the company's books. For 1946 a partnership return was filed, showing an allocation of the company's earnings equally between Harry and Joe C. Sparks. For 1947 the allocation was 85 per cent to Harry and 15 per cent to Joe. A partial examination of Harry's individual income tax returns for 1947 was made by an internal revenue agent. The report of examination stated that the profits and losses reported by Harry from five partnerships had been verified with the partnership returns, and the amounts were found correct as verified. One of these partnerships was H. L. Sparks & Company. The *251 report of examination recommended that Harry's individual return for 1947 be accepted as filed. For 1948, 1949 and subsequent years, 70 per cent of the income of the company was credited to Harry for his services and the remaining 30 per cent of its income was divided equally between Harry and Joe C. Sparks. The income from the business allocated to Joe C. Sparks for 1948 and 1949 was included in Harry's income by respondent. For the years 1941 through 1949 the income of H. L. Sparks & Company was credited on the company's books to accounts in the names of Harry, Wanda and Joe C. Sparks, in the following amounts: Harry
Joe
Rex
Year
L. Sparks
C. Sparks
Wanda Sparks
1941
$ 14,318.66
$11,318.66
1942
11,645.61
$ 8,645.62
1943
30,205.08
27,205.07
1944
18,880.97
1945
12,638.33
1946
16,980.20
16,980.20
1947
52,659.84
9,292.91
1948
137,796.15
24,316.97
1949
51,221.82
9,039.14
Joe C. Sparks rendered no personal services to H. L. Sparks & Company during the years 1941 to 1949, inclusive. No withdrawal of cash or other property was made from H. L. Sparks & Company for or on behalf of Joe C. Sparks from 1942 through 1949 except in *252 payment of the latter's Federal income taxes. The support expenses of Joe C. Sparks were paid by Harry from the latter's funds. Opinion TIETJENS, Judge: The only question in this case is whether Harry and his son, Joe C. Sparks, were business partners in 1948 and 1949. To prevail here petitioners must meet the standard for determining the validity of partnerships that was evolved by the Supreme Court in , , and : "whether * * * the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." . To determine the intent with which the parties acted we must appraise all of the circumstances of their transaction - "the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, *253 and any other facts throwing light on their true intent * * *." [] We turn now to an examination of the circumstances of this case in the light of the foregoing test. Petitioners have stipulated that Joe contributed no personal services to the partnership between 1941 and 1949. At the time the partnership was allegedly formed, in 1941, Joe was three years old, and he was ten and eleven during the taxable years in question. They rest their case on the claim that Joe made a substantial contribution of capital to the business, which did not originate with the continuing partner (Harry) and which was an important factor in producing income for the business. The weakness of this argument is simply that it is not based on what actually happened. Joe made no capital contribution to the business. The only new capital that came into the business was that contributed by Wanda late in 1940, and this was contributed with the alleged intention that Wanda, not Joe, become a partner. One year later Wanda executed an assignment of her interest to Joe. The significance of a capital contribution is that it is considered some indication of parties' intention *254 to join together as partners. Thus the fact that Wanda made a capital contribution in 1940, which was made with the alleged intention that she become a partner, seems to us to have no bearing on the question whether the intention one year later was that Harry and Joe join together in the present conduct of the business. In light of the factual sequence, for Wanda's capital contribution to have any significance, insofar as indicating the state of mind of the parties in December 1941, there should have been a showing that it was important to the business at that time, and that its continued use in the business was conditioned on Harry's accepting Joe as a partner. Otherwise there would have been no business inducement to Harry to accept Joe as a partner. Petitioners have not made this showing. It could hardly be contended (and petitioners do not so contend) that Joe became a partner by virtue merely of the assignment to him from Wanda. To so hold would permit the formation of partnerships on the basis of paper formalities rather than the realities of the alleged partners' relationship. The fact that partnership status is claimed by assignment does not lessen the burden of showing *255 that the resulting partners in good faith and acting with a business purpose intended to join together in the present conduct of an enterprise. However, we need not rely solely on the above ground for upholding respondent's determination. Not only is petitioners' evidence of intention at the time the partnership was allegedly formed inadequate, but it affirmatively appears from other circumstances that there was no real intention to make Joe a partner. We think that petitioners in their argument grossly overstate the significance of Wanda's contribution to the business (assuming it has a bearing on Harry's intention to accept Joe as a partner). The business being conducted by Harry was a personal service business, dependent on his skill and energy for its success. It was financed largely by Harry's depositing sales checks received by him before his own checks given in payment for hogs cleared his bank. Principally by this method he was able to finance the large gross sales of the business. This is not to say that Wanda's $5,000 contribution may not have been important to the business when received. But the making of a capital contribution does not automatically make one a partner. *256 Cf. Nellie Russo Linsenmeyer, 25 T.C. - (Feb. 29, 1956). As we have stated, it is one of the factors in determining the intention of the parties. We say that as such a factor, in view of the nature of the business, it does not have the significance in determining intention that petitioners claim for it. In addition there are other factors indicating a lack of the necessary intention: There was no partnership agreement between Harry and anyone acting on Joe's behalf. The assignment from Wanda to Joe stated that it was subject to the agreements (of January 2, 1941 and December 20, 1941) between Harry and Wanda. There were year-to-year changes in the percentage of Joe's alleged partnership earnings, and a few years after 1941 Joe's interest in Midwest Order Buyers was simply eliminated at Harry's sole direction because Midwest began to show a loss, thereby making it appear that Joe was a "partner" sharing only in the gains of the business but not in the losses. The actual control of the business and its earnings remained in Harry. Earnings were allocated to Joe on the company's books (except in 1944 and 1945) but never distributed, being used in the business. There were glaring inconsistencies *257 in stating the amount of Joe's partnership interest between the annual settlement statements filed by petitioners as curators of Joe's estate and the company books. To us these factors indicate that petitioners were merely going through the formalities without any real intention that Harry and Joe be partners. Finally, the evidence here, particularly petitioners' testimony, convinces us that their only intention in setting up the partnership arrangement was to provide for Joe's financial security, not to make him a real business partner. On direct examination Harry indicated that he agreed to his wife's request to turn over her interest in the business to Joe in order to build up an estate for the boy, since Harry was loose with his money, was older than Wanda and had a married daughter by a first marriage. On direct examination Wanda's testimony as to the reasons for setting up the partnership was as follows: "Q. Was that the reason [the expectation that Joe would go into the business] you gave him [Joe] your partnership interest? "A. No, that wasn't because I couldn't tell when he was four years old what he was going to do when he was 21. I was trying to protect his future *258 and thinking about all those years that he would need to be provided for if anything should happen to my husband." In our view such an intention, without more, is not the intention required by the legal principles applicable to family partnership. Cf. ; The partnership relation is founded on a mutual business interest, not alone on a desire to provide financial security for one's child. In conclusion, therefore, we hold that petitioners have failed to sustain their burden of showing that there was a good faith intention that Harry and Joe join together in the present conduct of the business, and have failed to show that Harry and Joe were partners during the taxable years in question. Decision will be entered for the respondent.